**GARFIELD INV. CORP.**

v.

**CITY OF ENID.**

Civ. A. No. 5566.

United States District Court
W. D. Oklahoma.
May 26, 1954.

Otjen, Carter & Musser, Enid, Okl., for plaintiff.

H. L. Gasaway, City Atty., and Elam & Crowley, Enid, Okl., for defendant.

John Swinford (of Embry, Johnson, Crowe, Tolbert & Boxley), Oklahoma City, Okl., for intervener.

WALLACE, District Judge.

The plaintiff, Garfield Investment Corporation, a Delaware corporation, instituted this action against the defendant, City of Enid, Oklahoma (herein referred to as City), to recover $36,510.50 paid out in property assessments in connection with the construction of an outfall sewer line located in Enid.

The City, after answering and denying liability for such sums expended by the plaintiff, passed a resolution, in a special session of the Mayor and Board of City Commissioners, agreeing to compromise the alleged claim for the sum of $16,000.

Although the plaintiff considered this settlement figure satisfactory, before an agreed judgment could be entered for this amount, Charles Knox, a citizen and taxpayer of the City of Enid, intervened and contested the City's authority to settle this claim for the reason that

such claim was not legally enforceable against said municipality.[1]

Evidence submitted at the time of trial revealed the following facts:

(1) In 1948 the City, through its officers, the Mayor and Board of Commissioners, and other civic minded persons, including members of the Chamber of Commerce, encouraged the re-activation of the Enid Air Base. In discussing the re-activation of this base with the Secretary of the Air Force and other army officials the City officials promised that adequate housing facilities would be constructed—the need for which had been pointed out by the army officials.

(2) In a meeting called and promoted by City officials and other civic minded persons, various real estate dealers, contractors and developers living in Enid, pledged the construction of specific numbers of housing units. Such was in furtherance of the assurance by the City officials to the army officials that adequate housing would be available. The plaintiff corporation was one of the developers making such a pledge.

(3) In the spring of 1949, the plaintiff in making preparations for the development of a tract of land it owned lying some two miles north of the Air Base to be re-activated, learned that there was no main sewer line available to dispose of sewage from the plaintiff's tract to the City Sewer Disposal Plant located some 9,000 feet from said tract. At this particluar time the City had no funds available with which to construct a main sewer or outfall line and so advised the plaintiff; although, several officials told the plaintiff that at some future date funds for such a purpose might be available.

(4) The plaintiff being anxious to go ahead with its development project (and hoping that reimbursement for the outfall line could be obtained from the City treasury at some future date) petitioned the City on March 3, 1949, to create a sanitary sewer district covering exclusively 54 acres of the plaintiff's land then being developed which acreage was known as the Wallace First and Second Additions; at the time of this petition plaintiff knew that to create such a district an outfall line would be necessary.

(5) On March 3, 1949, Ordinance No. 3224 was duly and legally enacted by the City; and, on March 14, 1949, this ordinance was regularly published. The ordinance, as requested in plaintiff's petition, established Sewer District No. 199 which district was composed solely of the Wallace First and Second Additions.

(6) On March 17, 1949, the defendant City approved the plans and specifications for District No. 199 and directed that advertisement for bids be made.

(7) On July 12, 1949, the final acceptance and estimate of the City Engineer in regard to the total cost of the sanitary sewer in District No. 199 in the amount of $77,340.90 was accepted by the City; at the same time the City duly enacted Ordinance No. 3245 assessing the entire cost of the sanitary sewer to the property lying within said district. This ordinance was duly published on July 13, 1949.

(8) Of the total assessment of $77,340.90, $36,510.50 was attributable to the outfall line in issue.

(9) On September 30, 1949, the plaintiff paid the total assessments which had been levied against its properties in District No. 199 and discharged the property liens.

(10) Although the outfall line in question was planned for the immediate purpose and objective of serving District No. 199 (the 54 acres owned by plaintiff and known as the Wallace First and Second Additions) the outfall line was intended to drain an added 23 acres through which acreage the outfall line would pass on its way to the disposal plant;[2] and, was designed to be ade-

1. See Threadgill v. Peterson, 1923, 95 Okl. 187, 219 P. 389 for authority of taxpayer to intervene.

2. The owners of the land through which the outfall line was to be constructed in return for granting the necessary ease-

quate to in the future drain 71 acres in the Kesterfield Addition, lying immediately north of District No. 199 and in addition 24 acres owned by the plaintiff to the east of said district (later denominated Wallace Third and Fourth Additions).[3]

(11) In addition to the planned drainage mentioned in Finding No. 10, supra, the City is now draining into and through this outfall line sewage from an additional 266 acres of densely populated areas.

█ Patently, all the equities in this suit appear to be with the plaintiff corporation. However, the Court has reached the conclusion that the money paid out by the plaintiff in connection with financing the outfall line in question is not legally recoverable from the defendant City; consequently, the officials of the City have no authority to compromise and settle this contested claim.

The plaintiff relies principally upon section 273 of the Oklahoma Statutes dealing with "Cities and Towns" in urging that the City is statutorily bound to pay for the instant outfall line;[4] this section provides in part:

"Except as herein otherwise provided, the construction and maintenance of public sanitary sewers and storm sewers in cities and towns shall be paid for as follows: *Mains and sub-mains of whatever size or extent, shall be paid for by the city or town,* except that where a petition signed by the owners of more than one-half in area of the land that will be drained or benefited by the construction of such mains or sub-mains, the mayor and council or the board of trustees or other legislative body may create a district and order the construction of such mains and sub-mains and provide for the payment therefor to be made by the owners of the property included within such district in accordance with the procedure for the construction of and payment for district sewers as is provided in Section 4405 [11 Okl.Stat.1951 § 277] * * *". (Emphasis supplied.)

There is no doubt but what the outfall line in question comes within the definition of "Mains and sub-mains" as used in the just-quoted statute;[5] and, unless the property assessments made herein by the City came within a recognized exception to the general statutory rule making cities and towns liable for "mains and sub-mains" the defendant City would be financially responsible for the instant outfall line and the assessments made against plaintiff's properties would be invalid.

However, the Court believes that the assessments made by the City wherein the outfall line was treated as a part of a validly established sewer district bring the outfall line in question within a recognized exception contained in the statute and validates said assessments.

At the time the outfall line was planned and constructed the immediate beneficiary, other than those landowners who granted easements to be used in the laying of this line in return for the privilege of attaching on thereto, was the

ments were given the right to attach their laterals to said line.

3. Apparently, the Wallace Additions, fully occupied would use not more than 23⅓ per cent of the capacity of the line. This line was constructed of 12 inch pipe and ran 9,106 feet in length from the Wallace Additions to the disposal plant.

4. 11 Okl.Stat.1951, § 273.

5. As observed in Boswell v. Chambless, 1941, 189 Okl. 112, 113 P.2d 832, 834:

"Looking at the statutes we find that sewers are classified as public, district, and private (sec. 6044 [11 O.S.1951 § 271]), and that mains and sub-mains are considered public sewers (sec. 6046 [11 O.S.1951 § 273]). There is no statutory exception to this latter classification. That portion of a system of sewers which serves as an out-let for the laterals can be classified in no other way than as a main or sub-main, and therefore a public sewer is distinguished from a district sewer. * * *"

plaintiff company who found it imperative to arrange for the disposal of sewage from the Wallace First and Second Addition over to the disposal plant. Although the engineers in planning the size and type of outfall main to be constructed took into account the future needs of surrounding and adjacent areas, only the 54 acres included in District No. 199 were to be drained and benefited immediately at the time of the construction of this main and the ensuing property assessments.

■ The plaintiff, by its vice-president and principal stockholder, petitioned for the creation of the sewer district in question and at that time knew that an outfall line was necessary;[6] thus, in conformity with the express exception in section 273, supra, a sewer district was created pursuant to the lodging of a petition by the owner of more than one-half of the area to be immediately drained and benefited; in addition, without rendering legal protests, the plaintiff company, the sole property owner in such district, paid the levied assessments with full knowledge that the assessments included the cost of the outfall line.[7] Such facts serve to distinguish the instant case from Boswell v. Chambless wherein the Court in holding the city financially responsible for the cost of the sewer main there involved, *in addition to finding that no petition for the formation of* the sewer district had been filed by the property owners, observed:[8]

"Defendant argues that since the plaintiffs admitted that the sewer tax warrants were valid and not subject to attack after sixty days, they in effect conceded the validity of the entire proceedings in the matter of construction of the sewer, including the assessments as made, and for that reason could not state a cause of action against the city in the former case. But we see in this no admission that would relieve the city of the obligation to pay that portion of the costs of the project which the statute plainly says it must pay. *The city was not without authority to construct the sewer system according to the plan adopted and followed, but it could not unload its share of the expense onto the property owners of the district without their consent. The trial court in the former case held that they had neither consented to such assessment nor waived their right to object thereto. At the former trial the court found that nothing appeared on the face of the sewer proceeding to warn the property owners that the costs of mains and sub-mains were being assessed against their property,* and that settles that issue." (Emphasis supplied.)

6. Although as pointed out by the plaintiff the petition was merely signed "Garfield Investment Corporation, By Bruce E. Wallace, Vice President" and was not attested by the Secretary as required of instruments generally by 16 Okl.Stat. § 94, such an irregularity is immaterial. Not only was the petition presented by the leading stockholder but the action taken by the City in response to such petition was known and acquiesced in by the plaintiff corporation so as to estop the plaintiff corporation from denying the validity of such petition.

7. The most that can be said for the plaintiff's position is that it by petition initiated the forming of the sewer district in question and needed outfall line and paid the total construction cost, represented by the assessments, in the mistaken belief that at some future date it could gain reimbursement from the City. Cf. City of Wewoka v. Dunn, 1949, 201 Okl. 286, 205 P.2d 291, 294 wherein it is said: "It is settled law in this state that money voluntarily paid with full knowledge of the facts may not be recovered. In Hadley v. Farmers' National Bank, 125 Okl. 250, 257 P. 1101, 53 A.L.R. 943, we said: 'Money voluntarily paid, with full knowledge of all the facts under which it was demanded, cannot be recovered back upon the ground that payment was made under a misapprehension of the legal rights and obligations of the party paying.'"

8. Fn. 5, supra, 113 P.2d at pages 834, 835.

Significantly, section 274 of this same title [9] when construed along with section 273 lends further force to the conclusion that the assessments in question were valid and that the plaintiff as property owner was legally liable for the cost of said outfall line; section 274 provides:

"District sewers shall be established within the limits of the districts, to be prescribed by ordinance, and shall connect with public sewers or other district sewers, or with the natural course of drainage, as each case may be. * * * *The governing body shall cause sewers to be constructed in each district whenever the owners of more than one-half (½) the area of the land liable to assessments for said sewers shall petition therefor, and said sewers* shall be of such dimensions and materials as may be prescribed by ordinance, and may be changed, enlarged or extended, and shall have all the necessary laterals, inlets, catch-basins, manholes and other appurtenances, and *may include mains and sub-mains where the same are within the limits of the district or are necessary outlets thereto.* The cost of such district sewer shall be assessed and collected as hereinafter provided; but the city shall incur no liability for building district sewers, except when the city is the owner of a lot within the district, and in that case the city shall be liable for the costs of said sewer in the same manner as other property owners within the district." (Emphasis supplied.)

The Court is satisfied that the conduct of the parties in the instant case brings the entire sewage construction in issue within the purview of this section. Although it may be forcibly argued that taken alone the broad wording of section 273, supra, "Where a petition signed by the owners of more than one-half in area of the land that will be drained or benefited by the construction of such mains or sub-mains" would raise some question in regard to the effectiveness of plaintiff's petition inasmuch as it has developed that the acreage owned by plaintiff at the time of the petition was much less than one-half of the total area eventually "drained or benefited", the petition clearly is effective when viewed in connection with the more specific language of section 274 dealing with "district sewers"; this latter section recognizes that a valid petition may be filed "whenever the owners of more than one-half (½) the area of the land liable to assessments for said sewers shall petition therefor". Here, the plaintiff in petitioning for the sewer district in question owned all the property within the requested sewer district and all the property "liable to assessments". Moreover, this same section dealing with the establishment of sewer districts provides that a main or submain, such as the outfall line in issue, may be included as a part of the district and the cost assessed against the property therein where such mains or submains are "necessary outlets thereto." Thus, even though the outfall line in issue is benefiting many acres not originally drained at the time of its construction such line beyond question was a "necessary outlet" to District No. 199 and the plaintiff as sole property owner in said district at the time of its creation had the authority to require the establishment of a sewer district; and, correlatively, the City of Enid, in response to the petition had the authority to assess the property situate in the new district for any outlet necessary for the creation and putting into service of the petitioned sewage district.

Although the facts in the instant case appear a little harsh and inequitable the applicable law seems clear. If the legislature had intended that all municipalities be obligated without exception to stand the financial burden for the construction of all mains and sub-mains it

9. 11 Okl.Stat.1951 § 274.

would have been a very simple matter for the legislature to so provide. However, recognizing that variously located property owners might find it to their immediate advantage to be able to have a district created even in the face of standing the cost of the mains and sub-mains, where the City at large might not deem it advisable to construct the particular mains or sub-mains for the good of the municipality generally, the legislature provided the specific exception under consideration in sections 273 and 274, supra. The instant case pointedly falls within this exception.

The plaintiff, in need of the establishment of a sewer district, petitioned for the district knowing that an outlet to the disposal plant would be necessary. Although, others in the future would benefit from the presence of such a line, the plaintiff was the immediate beneficiary and the one primarily interested in its construction. In view of the petition and the plaintiff's complete knowledge of the facts and circumstances surrounding the establishment of the sewer district, the City of Enid had the authority to plan for the necessary outlet and assess the cost thereof against the petitioning property owner.

Once the plaintiff property owner petitioned the City to establish a sewer district and conferred jurisdiction upon said municipality for that purpose, the finding that the outfall line in question was a "necessary outlet" and properly assessable against the property located in such district was legislative in character and was final.[10]

Apart from the question of plaintiff's rights insofar as the merits of this case are concerned, the Court is of the impression that the plaintiff's cause of action is barred by the statute of limitation.

All parties agree that the three-year statute of limitation is applicable to this action.[11] The instant case was filed August 29, 1952. Although the plaintiff formally takes the position that this action in essence is not one challenging the validity of the original assessments or one to set aside such assessments, but is an action brought for the recovery of money paid out for a purpose which the City itself was by statute obligated to pay, the Court believes that the plaintiff's right to recover is directly traceable to the invalidity or validity of the assessments made against its properties. If the plaintiff has paid out money for a purpose which by statute the City, rather than the plaintiff, is financially responsible, then the assessments made by the City against the plaintiff's properties were invalid and the plaintiff's cause of action arose at the time these invalid assessments were made; the plaintiff immediately had the right to legally challenge these assessments and establish their illegality. According to stipulation, the City of Enid, on July 12, 1949, accepted the final acceptance and estimate of the City Engineer of the cost of the sanitary sewer in District No. 199 and on said date duly enacted Ordinance No. 3245 assessing the cost of said sanitary sewer to the plaintiff's properties which comprised said district. This ordinance was duly published July 13, 1949. As recognized by the plaintiff, its cause of action, if any, is based upon statute rather than

10. The pivotal point is simply whether the City obtained jurisdiction to establish the district. Such jurisdiction can be gained either by property owners petitioning for a sewer district, as in the instant case, or by the City initiating the proceedings and no formal protests being lodged by interested property owners. See City of Bartlesville v. Keeler, 107 Okl. 14, 229 P. 450, 452, where in syllabus No. 2 the Court said: "The question of benefits to accrue or likely to accrue on properties charged with a lien for the payment of the cost price of the construction of district sewers is legislative in its nature, and the determination thereof by the legislative branch of the municipality is conclusive on the courts. Newman v. Warner-Quinlan Asphalt Co., 71 Okl. 284, 177 P. 375." See also, Harrington v. City of Tulsa, 1934, 170 Okl. 20, 39 P. 2d 120, 123, 124.

11. See 12 Okl.Stat.1951 § 95(2).

contract; hence, once the City assessed the plaintiff's property contrary to statute plaintiff's right of action accrued.

■ If the plaintiff, apart from statute, could establish an action based upon the theory of unjust enrichment or money had and received, then logically the cause of action would come into being at the time the money was actually paid out by the plaintiff, that is, September 30, 1949; and, this cause would have been instituted within the three year period. However, the Oklahoma law appears to be well settled that under the facts in the instant case no such action lies against the defendant municipality. As mentioned in State ex rel. Board of County Commissioners of Harmon County v. Oklahoma Tax Commission,[12]

"We believe it is clear that there can be no valid implied contract, or a contract or agency or representation by acquiescence, ratification or estoppel, binding upon a municipality where there can be no valid express contract. (Citing cases.)"

There is little question but what the officers of the defendant City had no authority to *expressly* contract with the plaintiff and become liable for the cost of the outfall line for the reason that such an indebtedness under the Oklahoma Constitution would have had to have been created by a vote of the people. Article 10, section 26, provides:

"No * * * city * * * shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election, held for that purpose".

The recognized cost of the outfall line in question was $36,510.50. The evidence indicates that at the time this line was planned and constructed and the liability for cost incurred, in 1949, the defendant municipality did not have sufficient funds for the year's revenue free of other commitments which could be used to pay for such line. The City officials told the plaintiff in February and March of 1949 that the City did not have sufficient funds to pay for any such improvement. Plaintiff attempts to harmonize such statements by saying that although in February and March of 1949 the City did not have sufficient funds, that by the end of the fiscal year June 30, 1949, there were sufficient funds in the treasury in the form of surplus.

■ This attempted rationale does not appeal to this Court for the reason that the plaintiff's entire case is bottomed upon the general assertion that the plaintiff in September of 1949 paid out money which the City of Enid should have paid, but which money the City at that particular time did not have. Where the over-all tenor of the evidence indicates that at the time the indebtedness in question was incurred the municipality did not have the money to pay such indebtedness such an obligation could not be *voluntarily* incurred by the municipality and consequently there can be no action based upon implied contract against the City.[13]

12. 1944, 194 Okl. 395, 151 P.2d 797, 799.

13. See First National Bank of Norman v. City of Norman, 1938, 182 Okl. 7, 75 P. 2d 1109 wherein the Court in its syllabi said: "1. Claim for auditing services rendered pursuant to contract with municipality, where no appropriation has been made for same, held, properly denied in view of constitutional debt limitation. Section 26, article 10, Okl.Const. * * * 4. Where the constitutional debt limitation contained in section 26 of article 10, Oklahoma Constitution, precludes recovery against the municipality, individual equities do not usually affect the question." This constitutional limitation is further limited by 62 Okl.Stat.1951 § 479 which provides: "It shall be unlawful for the (municipal officials) * * * to make any contract for, incur, acknowledge, approve, allow or authorize any indebtedness against their respective municipality or authorize it to be done by others, in excess of the estimate made and approved by the excise board for such purpose for such current fiscal year, or in excess of the specific amount authorized for such purpose by a bond issue.

It may be that if the indebtedness in question were deemed a statutory indebtedness against the City of Enid that such could be viewed as an *involuntary* rather than voluntary debt and that the constitutional provision calling for a vote of the people would be inapplicable,[14] although in light of the Court's expressed view of this case, this particular issue need not be and is not resolved.

The defendant municipal corporation is entitled to judgment. Counsel should submit a journal entry which conforms with this opinion within 15 days.

---

\* \* \*" See also, State ex rel. Board of County Commissioners of Harmon County v. Oklahoma Tax Commission, 1944, 194 Okl. 359, 151 P.2d 797. Cf. Dowler v. State, 1937, 179 Okl. 532, 66 P.2d 1081; Buxton & Skinner Stationery Company v. Board of County Commissioners of Craig County, 1916, 53 Okl. 65, 155 P. 215. ·

14. Read: Liberty National Bank v. County Excise Board of Jefferson County, 1935, 175 Okl. 245, 52 P.2d 51; Board of Commissioners of Tulsa County v. Mullins, 1950, 202 Okl. 628, 217 P.2d 835; Wilson v. City of Hollis, 1943, 193 Okl. 241, 142 P.2d 633, 150 A.L.R. 1385; Board of Education of City of Chickasha v. City of Chickasha ex rel. Pool, 1945, 195 Okl. 127, 155 P.2d 723. However,· cf. Hood v. Jones, 1935, 174 Okl. 372, 50 P.2d 1124.